INVENTIONS CORP. v. HOBBS et al.

(Circuit Court of Appeals, Second Circuit.   May 8, 1917.)

No. 259.

1. CORPORATIONS ☜548(9)—GRANT OF LICENSES UNDER PATENTS—KNOWLEDGE AND INTENT OF LICENSEE.

A judgment creditor of a corporation which was the owner of patents, *held*, on the evidence, not entitled to the cancellation of certain license contracts made by the company pending the action which resulted in the. judgment as having been made to hinder, delay, and defraud creditors, the action being one at law which left the corporation free to contract, and it appearing that the licensees acted in good faith for their own interest and paid a substantial and reasonable amount under all the circumstances for the rights secured.

2. CORPORATIONS ☜523—PROCEEDINGS SUPPLEMENTARY TO EXECUTION—SERVICE—FRAUDULENT RESIGNATION OF OFFICERS.

Code Civ. Proc. N. Y. §§ 2468, 2469, provide that the property of a judgment debtor vests in a receiver appointed in supplementary proceedings from the date of his appointment, and that when it has become so vested it relates back for the benefit of the judgment creditor in case an order requiring.the debtor to appear for examination has been served to the date of such service. In such a proceeding against a nonresident corporation service of an order for examination was made on a resident who had been and was still supposed to be the president and a director of the defendant, and he appeared with counsel without objection. He had previously resigned as president, and his resignation had been accepted. He had also later sent his resignation as director, which was not accepted until afterward. The resignations were part of a fraudulent scheme to prevent the collection of the judgment. The proceedings resulted in the appointment of a receiver. *Held*, that whatever the effect of the fact that his resignation as director had not at that time been accepted might have as between him and the corporation, the resignation was not effective as against the judgment creditor, and the service on him was a valid service on the corporation, and carried back the receiver's title to that date to the exclusion of that of a trustee in bankruptcy appointed in voluntary proceedings instituted more than four months thereafter.

3. EXECUTION   ☜409—SUPPLEMENTARY   PROCEEDINGS—RECEIVERS—SALE   OF PATENTS.

While a receiver in supplementary proceedings may not, by virtue of his appointment, acquire title to patents so as to enable him to execute a

valid assignment to a purchaser, a court of equity has power to order such assignments made by the proper person.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Inventions Corporation against John H. Hobbs, Harris Hammond, Clyde H. Slease, Lewis C. Van Riper, the Continental Motion Picture Company, Incorporated, the Vanoscope Company, Incorporated, and Henry B. Singer, as trustee in bankruptcy of the Vanoscope Company. From the decree complainant appeals. Modified and affirmed.

See, also, 233 Fed. 53, 147 C. C. A. 123; 244 Fed. 445, —— C. C. A. ——.

The following is the opinion of Learned Hand, District Judge:

The turning point of this case on the merits is whether the two contracts of May 9, 1914, and April 10, 1915, were in fraud of Robinson. It is of no consequence whether Hobbs and Hammond had earlier designs upon the stock of the Vanoscope Company which might have conflicted with Robinson's contract. If there is no evidence that the license agreements obstructed the collection of Robinson's claim, then this case must fall, regardless of other consideration. This claim before May 9, 1914, had become no more than for money, and later resulted in a judgment for money: obviously, there could be no fraud affecting the judgment which did not diminish the value of the property of the Vanoscope Company subject to be reached in execution. Now it is true that the Vanoscope Company under the contract parted with the right to exploit its patent except for the manufacture of home machines, and that this was the practical equivalent of an assignment to that extent of its rights. As the patent could have been made available upon Robinson's claim—though not subject to levy under execution—and as the license agreements prevented him from getting the benefit of the full value of the patents upon sale or the like, certainly it is true that they hindered and delayed him prima facie in his rights as a creditor. Yet these same agreements contained considerations, which gave the Vanoscope Company certain rights having more than merely a colorable value, and therefore the case is not one where the contract is a mere device to cover a gratuitous grant. The intent to hinder creditors does not follow necessarily from such agreements; it must independently appear that they were made with that intent. That Robinson should be hindered in his remedies against the patents would equally follow from any sale, yet the sale would not be fraudulent if the consideration was reasonably sufficient and equally available to him. In such cases it must appear that the parties were actuated by a desire to prevent the creditor from getting as much as he otherwise would, and that without added trouble.

There is no such proof respecting the first agreement, that of May 9, 1914. The payment down of $50,000 for a patent which had never been exploited, and which depended absolutely for any value upon its future success would alone suggest that the parties were not concerned in defrauding Robinson. The plaintiff urges that I must suppose that Van Riper appropriated this money, and that Hobbs & Hammond were in collusion with him. There is not a whit of evidence remotely suggesting any collusion between Van Riper and the New York Company if Van Riper embezzled the money, and there is indeed no evidence that he did embezzle it, except in so far as one may guess so from its disappearance.

Yet if I were to disregard this initial payment, and consider the contract as though it had not been paid, it would still not give any evidence of fraud. It contemplated the manufacture of 1,000 machines which were to be leased at between $20 and $30 a month. This meant, if the machine turned out a success, a gross return of between $240,000 and $360,000 during the first year of full exploitation. If we take the lower of these two figures the account between the two parties for the first seven years would have been as follows:

| Vanoscope Co., Inc. | Vanoscope | Company. |
|---|---|---|
| Operating expenses.................................$ | 60,000 | $240,000 |
| Common dividend................................... | 42,000 | |
| | $102,000 | |
| Preferred sinking fund............................. | 45,000 | |
| Average preferred stock dividend.................... | 10,500 | 157,500 |
| | $157,500 | $82,500 |

In this account I have figured the average of the preferred stock dividends, since they were to be computed each year upon only so much as the accumulated sinking fund should not cover at 105. I have also disregarded the repayment of $50,000 for the obvious reason that it had already been paid out to Vanoscope Company as advanced royalties. The preferred stock represented the outside amount of capital to be invested, and the provisions for its redemption were certainly intended to repay the New York Company for all expenses of actual manufacture. The redemption provisions were therefore meant to be a way of repaying the expenses of manufacture; at least there was no other. The other expense was of general exploitation of the machines, of "operating" as it was called, which was fixed at 25 per cent. That this was a genuine estimate and not colorable is to be in any case assumed, and is strongly fortified, since it is the tentative figure fixed in the proposed contract between the Johns-Manville Company and the New York Company of the succeeding winter, into the negotiation of which no fraud could possibly have entered.

The result of the contract of May 9, 1914, was therefore that the real profits to the New York Company consisted of 7 per cent. on the preferred stock and 6 per cent. on the common stock of $700,000, which was all water. If the preferred dividend be averaged as above and the stock redemption and "operating" percentage be regarded as genuine expenses, the division if 1,000 machines were leased was $52,500 to the New York Company and $82,500 to the Vanoscope Company. If the machines had any life beyond seven years the division thereafter would have been $42,000 to the New York Company and $138,000 to the Vanoscope Company.

If the machines proved such a success that they could be rented for $30 a month, then the New York Company would have got the same return, but the Vanoscope Company $172,500 during the first seven years and $228,000 if the machine lived thereafter. In the second and third years the New York Company was to make 500 machines a year, and thereafter as many as the public required. The gross rentals on these were to be divided equally, with similar amortization agreements, if new capital were necessary.

It will be observed that the dividends are a first charge upon all earnings. and, as I shall show in another connection, the Vanoscope Company would not begin to make any money until more than 500 machines were leased at $20. It should also be observed that the amortization provision contains a premium of 15 per cent. on the preferred stock which may be sold at 90 and must be redeemed at 105. This adds 2 per cent. a year to the actual profits of the New York Company, or $6,000, and, strictly speaking, their return should figure at an average of $58,500 for the first seven years.

I can see nothing inequitable in this contract as a whole. It could not surely have been expected that capital must be forthcoming upon any such contingent enterprise at the mere return of 7 or 9 per cent. If we look at the common stock dividend as part of the interest, the aggregate rate was 23 per cent., certainly not exorbitant under the circumstances. The company had never put out a machine, had no capital to develop its business, and the value of the patent lay, and for that matter still lies, wholly in supposition. It is quite true that this capital might continue to draw 14 per cent. after it had been repaid, but we have no knowledge of the life of the machines; perhaps no one knew whether they would be of any value even as long as that. If I were compelled merely to guess, I should feel quite sure that the machines would be either disabled or antiquated long before the period fixed. I have

no hesitation in finding that the contract was not in fraud of Robinson, though it was made with full knowledge of his rights and of the action then pending.

Notice should be taken of a feature of the case not mentioned hitherto. Robinson swears that he showed to Hobbs and Hammond in February, 1914, a copy of his contract with Van Riper of October 31, 1912, part of which (article 2) gave him the exclusive agency to sell or lease machines or patents. This contract, though with Van Riper, was perhaps binding upon the Vanoscope Company, considering the control which Van Riper had of it. Hobbs and Hammond dispute Robinson's assertion that he ever showed them this clause of his contract, and I cannot make any certain finding in the case upon this conflict of testimony. The issue is nevertheless irrelevant in any case, because before May 9, 1914, Robinson had sued to recover damages for the breach of his contracts, and his position, therefore, on that date had already precluded him from recovering the stock, to which his rights of agency were only an incident. He had therefore put himself in a position where his right to any exclusive agency in selling machines or giving licenses under the patent had disappeared. Of this election Hobbs and Hammond had full notice, and their contract could not therefore have been in fraud of his rights under the Van Riper contract.

Manufacture under the contract was begun in July or August, 1914, and ten machines were started. None of them turned out satisfactory, and an issue arises as to whether the fault was of the New York Company's manufacturer, Garford, or of the design. It is quite clear that Berger in his letters of October was still experimenting with the machine to obviate a "vertical movement" of the films. Berger now says that the trouble was of the oxidization of the mirrors and of the metal which held them. At that time he did not mention those defects. Upon the conflict, if it be a conflict, between him and Lowenstein, I accept the latter as better qualified to judge, and I find that, regardless of any of the faults due to Garford, the machines had not yet been perfected. This conclusion is corroborated in some measure by two circumstances: First, that at least as late as December, 1913, or January, 1914, they had not been so perfected, for that was the issue in Robinson's suit; and, second, that none have yet appeared upon the market, though the defects mentioned by Berger could have been corrected by changes in material. Moreover, Berger himself made some changes, perhaps improvements to be sure, for which he is trying to get a patent. I am satisfied that the design was not commercially available in 1914.

Even though such were the fact, the plaintiff still insists that the New York Company was obliged to go on and make 1,000 machines or lose its deposit. Such a result would be grotesquely unjust and unreasonable; it would have been the surest way of destroying the patent and the interests of both parties to the agreement, and no court ought to put such a meaning on it unless the rules of law absolutely require it. They do not, because the case is clearly one where the contract was made under a common mistake of fact, each side thinking the machine already perfected in design. The suggested analogy of a sale caveat emptor is not applicable; in such sales there is no common mistake, for the seller knows, though he makes no representation. Moreover, if there is a common mistake, as for instance, regarding the actual existence of the goods, the contract of course may be voided. A seller has no interest in the goods sold after delivery; he cares only for the price. As to him the mistake, even if he shares in it, is not relevant to the transaction, so long as he gives no assurances to the buyer. But in the case at bar the licensor was as much interested as the licensee, because its payment, except the initial advance of $50,000, depended upon the success of the patent. If it had known the fault in design, it could not have intended the licensee to put out 1,000 machines; when it learned of the defect, it did not insist that the licensee should. To suggest that its failure to do so was evidence of fraud seems to me as perverse a position as the plaintiff could assume, and I pass it by.

The agreement of April 10, 1915, was made with a fuller knowledge, if possible, of Robinson's rights than its predecessor. The circumstances of its

execution lend some color to suspicion that it was made against the possibility of a verdict. I think it was certainly made with that prospect in mind and to settle the rights which had arisen under the first contract, but I cannot accept Harding's statement that it was to be used only in case of a verdict. Some new contract was, in any case, necessary between the parties, and the possibility of such a one is foreshadowed as far back as the proposed contract between the New York Company and the Johns-Manville Company. Moreover, it is most unlikely that the drafting was left till April 10, as Harding recalls; the contract is elaborate, and could not be made hastily out of the earlier one. It shows evidence of much care in preparation, and bears the indorsement of Hobbs' lawyers, contrary again to Harding's recollection. However, while I reject the idea that it was intended only for such use, the time of its appearance justifies a close scrutiny of its terms in comparison with those of the earlier contract.

The two are of the same general kind, the New York Company to manufacture and exploit the patent as its exclusive licensee, agreeing to make 1,000 machines within 18 months after the design had become commercially available, with 1,000 additional machines (really at its option) within the following year. The only important distinction between the two is in the division of the rentals which were to be the same as in the earlier. Under the old contract the New York Company was to repay itself the cost of manufacture by an amortization clause redeeming the preferred stock in seven years at 15 per cent. a year. This redemption included also a 15 per cent. appreciation of the stock, which might be issued at 90 per cent. and was to be redeemed at 105 per cent. In estimating the cost of manufacture we should therefore take a yearly allowance of 13 per cent. upon the preferred capital for seven years, or $39,000 a year. This is obviously tentative, but for 1,000 machines as near as we can get. The old contract also allowed 25 per cent. of the gross rentals as expenses of exploitation, which must be admitted, making an added item of $60,000 a year to keep out 1,000 in the hands of exhibitors. Thus there would be a yearly outlay of $99,000 and a net income or profit of $141,000 under the old contract.

We have seen that the average yearly profits of the New York Company amounted to $58,500, which is therefore between 41 per cent. and 42 per cent. of the net profits so calculated. On the face of the second contract this gives place to 66⅔ per cent. of the net profits to the New York Company for the same undertaking as they entered into in the first. But there is one important difference between the two which should be remembered; the New York Company had a priority under the first contract for all its profits, while under the second it had none. The practical results of this are extremely important. Thus under the first contract the Vanoscope Company would have received in average yearly profits only $1,500, although 550 machines were leased for seven years at $20 a month. Under the second contract they would have received an average profit of $20,000 out of the same gross rentals. The New York Company would have received under the first contract $58,500, and out of the second, $40,000. Again, if 700 machines were leased, under the first contract the New York Company would have got $58,500 profits and the Vanoscope Company $28,500, while under the second contract the figures would be, respectively, $58,000 and $29,000. In short, until the rentals exceeded 700 machines, the first contract was not so good for the Vanoscope Company as the second. Thereafter the advantage to the Vanoscope Company of the first contract mounted very rapidly. Yet I cannot see how it is possible now to say absolutely whether this clause of the second contract as a whole was worse or better; obviously that turns altogether on the probability that more than 700 machines should be placed during the first seven years, or the greater part of them.

The difference is not ambiguous, however, respecting the clause regulating the returns on additional machines in subsequent years. Under the first contract there was to be an equal division of gross rentals, with the same amortization clause as applied in the case of the first 1,000 machines, if new capital should be necessary. Under the second contract the same division applied to all subsequent machines as to the first 1,000. Now there was a very

great difference in this provision, and all to the disadvantage of the Vanoscope Company. Moreover, if the patent turned out to be a great success, the first year of its exploitation would be of trifling consequence compared with the subsequent years.

This analysis of the contracts shows, I think, that although the Vanoscope Company was better protected under the second contract, if there were 700 machines or less put out the first year and none the next, yet if the patent proved profitable the advantage would have been enormously increased to the New York Company by the change. It is quite true that the New York Company assumed no duty to make the additional machines under either contract, the right being only an option, which was expressly not to carry any liability if not exercised, yet as an option it had changed so as to be of much greater value. In explanation of this change the defendants urge that it was to fit in with the proposed contract between the Johns-Manville Company and the New York Company, by which the latter was to give up one-half of its 66⅔ per cent. so that it shared equally with the Vanoscope Company. That is true, but it should be remembered that in so doing it avoided the obligation to supply capital for manufacture and to exploit the patent. The result of its arrangements with both companies was that the New York Company would get one-third of the net profits for securing such a contract from the Johns-Manville Company. I cannot therefore see that the proposed contract with this third party helps very much to a solution of the question of fraud.

That question should be regarded in two aspects: First, whether the second contract as a whole was worse for the Vanoscope Company; second, if so, whether such a change is evidence of fraud. The first question turns upon what were the prospects of success; the change was from a priority of limited profits to a higher percentage without priority. Obviously, the choice between these two depends altogether upon what the parties thought of the certainty of success. If the patent turned out only a moderate success, the change was a benefit to the Vanoscope Company; if it would continue to be used for many years, they would be serious losers. The patent had not turned out successful hitherto; there was genuine doubt whether it could ever be made available commercially, and, if so, how profitable it would be. To say even now how much the New York Company got for what it gave up seems to me impossible. It is quite true that people do not go into such enterprises except upon the hope of great prizes, but it is equally true that they know the great prizes are necessarily contingent, and that they insist upon a discount proportionate to their risk.

But assuming that the change was for the worse, it does not by any means follow that it was the result of fraud. The Vanoscope Company was in no position to compel the New York Company to go on with the existing contract. They had failed to produce a commercial machine, and could not possibly say when such a machine would be forthcoming, or whether it ever would. The New York Company had the right to go on at the old terms if it would, or it might repudiate the contract and do what it could to recover its $50,000 out of the patent, but it certainly was not obliged to go on with the contract as it stood. This was a situation giving room for a new contract, and as such the second contract does not seem to me fraudulent or unfair. The Vanoscope Company had no capital, and no financial support; it was in trouble with Robinson who might have, and did get, a large judgment against it. Its only asset, its patents, had no value without capital, whoever owned them, Robinson or some one else; they were untried, indeed, not even adjudicated; they had been quite unsuccessful; therefore I cannot see how I am to say that the procuring of such support as the Johns-Manville Company was willing to give through the mediation of the New York Company would not have been worth two-thirds of the net profits. Without something of the sort there would have been no profits at all to divide. It does not appear that Robinson could have done better. Whatever went on in the hearts of the defendants, I can find no evidence in the case which would justify a finding of fraud in the change, and I decline to find it. Indeed, such a finding would, at most, do no more than reinstate the contract of May 9, 1914, with leave to the New York Company to manufacture as soon as it developed a commercial ma-

chine. I do not even know whether this would suit the plaintiff, but in any case there is no evidence on which to base it.

I have preferred to consider the substance of the controversy rather than to endeavor to pick a way for the plaintiff through the legal obstacles in his path. It is extremely doubtful whether Truett's resignation can be disregarded or whether, if it can, this bill may be tacked on to the supplementary proceedings under the rule in Metcalf v. Barker, 187 U. S. 165, 23 Sup. Ct. 67, 47 L. Ed. 122. Still the New York courts have at times spoken as though the supplementary proceedings were the equivalent of such a bill (Lynch v. Johnson, 48 N. Y. 27), and perhaps this bill should be taken as a continuation of the supplementary proceedings. None of these questions is involved in the view I take of the merits.

Bill dismissed, with costs.

Hector M. Hitchings, of New York City, for appellant.

Wellman, Gooch & Smyth, of New York City (William A. Redding and Frederic C. Scofield, both of New York City, of counsel), for appellees.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

MAYER, District Judge. To understand clearly the questions here in issue, it is desirable to divide the controversy into two parts: (1) That relating to the effort to set aside certain license agreements; and (2) that relating to the character in law of certain proceedings following the obtaining of certain judgments by plaintiff's assignor.

[1] First. Plaintiff is the assignee of one William J. Robinson, Miriam E. Robinson, Hector M. Hitchings, and Irving E. Burdick, of their respective interests in a judgment recovered by Robinson against Vanoscope Company (hereinafter called Delaware Company. It is also the purchaser of whatever right, title, and interest the receiver in supplementary proceedings of the Delaware Company had in and to the assets of the Delaware Company. Defendants Hobbs and Hammond are officers of and stockholders in Vanoscope Company incorporated (hereinafter called New York Company), licensee of Delaware Company, by virtue of two license agreements dated, respectively, May 9, 1914, and April 10, 1915, and also licensee of defendant Continental Motion Picture Company, Incorporated, by virtue of a license agreement dated April 10, 1015. Defendant Slease died pending the action, and it has abated as to him, and defendant Van Riper was never served and did not appear. Defendant Singer is the trustee in bankruptcy of Delaware Company appointed on April 6, 1916, by the referee in a voluntary bankruptcy proceeding pending in the United States District Court for the Southern District of New York in place of a previous trustee who had resigned.

The suit is brought by plaintiff in the dual capacity of assignee of the judgment creditor and as purchaser at the sale by the receiver in supplementary proceedings.

The Delaware corporation was formed to exploit an invention for projecting moving pictures by means of revolving mirrors in such a manner as to do away with the necessity for the shutter to cut off the light between each picture.

We are not concerned with the scientific details of the invention; suffice it to say that if the structure should be perfected so as to be commercially practicable, the patent covering the invention and here concerned may prove to be of substantial value.

Van Riper, the inventor, and Robinson, as promoter, entered into a contract on October 31, 1912, and the Delaware corporation, in which Van Riper was the controlling spirit and Robinson also entered into a contract dated January 13, 1913, the details of which it is unnecessary to set forth, the essential feature being that Robinson obtained the exclusive right to dispose of a certain amount of preferred and common stock of the Delaware Company under certain mutual terms, and the Delaware Company agreed that it would not—

"sell, assign or transfer or enter into any contract or agreement of any kind for the sale, assignment or transfer of any of the said treasury stock of said first party (Delaware Company) during the existence of this contract. * * * "

Both Robinson and Van Riper made various attempts without success to sell stock to Hobbs and Hammond, who had become attracted by the invention. About January, 1914, Robinson commenced to have differences with Van Riper and with the board of directors composed of stockholders who had bought stock through Robinson. The condition of the company was most unsatisfactory from a financial standpoint, and it practically did not have any assets except the invention, and the stockholders were not willing to add to their previous investments.

In February, 1914, Hobbs and Van Riper entered into an agreement for the sale of stock owned by Van Riper, but that agreement was surrendered by mutual consent and was never acted upon.

On March 2, 1914, Robinson commenced an action at law in the District Court for the Southern District of New York, against the Delaware corporation and Van Riper, for damages for the breach of his contracts. This action was subsequently severed by order of the District Court so that thenceforth one action was against the Delaware Company and one against Van Riper.

On April 16, 1914, an agreement was entered into between the Delaware Company and a group known as the Hammond-Hobbs-Dyer syndicate, giving them an option upon a license agreement under the patents upon payment of $50.000 prior to May 1, 1914. Under this arrangement Hobbs and Hammond were relying upon Dyer to furnish the capital and upon his failure so to do the option was canceled.

Hobbs and Hammond, however, obtained the co-operation of A. L. Garford of Elyria, Ohio, to take up the Dyer interest in the contract, and Hobbs entered into a new contract with the Delaware Company for an option for the license agreement and paid $10,000 on account of the consideration therefor.

Garford is a large manufacturer of repute, well known in the business community and having large facilities in the way of tools and machinery for perfecting an invention of the character here concerned. Meanwhile, Hobbs and Hammond had become stockholders in a New York corporation known as Vanoscope Company, Incorporated. Plaintiff contends that this company was formed as a step in a

conspiracy in derogation of Robinson's rights, but we fail to find any evidence to sustain that contention. To carry out the proposition of Hobbs for a license agreement, the Delaware Company and the New York Company entered into a license agreement dated May 9, 1914, which was deposited with a trust company in escrow to be held by it until the completion of $50,000 advance royalty to be paid prior to the delivery thereof.

The District Judge has carefully and fully analyzed this license agreement and we agree with his conclusions in respect thereof. It is true that Hobbs and Hammond knew that Robinson had commenced his lawsuits but, in the circumstances, such a course by Robinson could not prevent the Delaware Company and outside inventors from entering into any legitimate agreement calculated to progress the development and sale of machines covered by the patents owned by the Delaware Company. Robinson, by beginning an action at law, had elected to discard any remedy in equity, if such were available to him. He was suing, not to restrain the Delaware Company, but to·obtain a money judgment for damages for breach of contract. The Delaware Company was not called upon to sit still and await the result of ·the Robinson action, nor were Hobbs and Hammond in any manner prevented from making any fair business arrangement. The cash advance of $50,000 and the various terms of the contract as discussed in detail by the District Judge are full assurance of the integrity of the transaction, and we have no doubt as to the validity of this agreement of May 9, 1914.

On March 20, 1915, a verdict was rendered in favor of Robinson against Van Riper upon which a judgment was entered for $100,110.95 on March 26, 1915. On April 7, 1915, the trial of the action of Robinson v. Delaware Co. was begun before Judge Hough and a jury, and that trial resulted on April 12, 1915, in a verdict upon which a judgment was entered on April 16, 1915, for $190,017.98. During the progress of this trial, viz. on April 10, 1915, Hobbs, Hammond, Van Riper, Hathaway, the president of defendant Continental Motion Picture Company, Incorporated, Slease, the attorney for Van Riper and the Delaware Company, and Harding, also one of the attorneys for Van Riper and the Delaware Company, met at luncheon at a club in Broad street and discussed the modification of the agreement of May 9, 1914, and a new agreement (drawn on the evening of April 9, 1915, by Wing & Russell, attorneys for Hobbs and Hammond) was entered into on April 10, 1915. This agreement was authorized by the board of directors of the Delaware Company and duly executed. At the same time a collateral agreement between defendant Continental Motion Picture Company, Incorporated, and the New York Company was executed for the nominal royalty of $1 per machine.

The agreement of April 10, 1915, between the Delaware Company and the New York Company recited, inter alia, that the Delaware Company was the owner of the entire right, title, and interest in and to applications for letters patent filed by Magnus Smith under the serial numbers 553,805 and 820,051. The agreement between Continental Motion Picture Company, Incorporated, and the New York

Company recited that the Continental Company was the owner of a patent issued to Smith No. 1,105,163 and of application serial number 820,051. (Note: No. 553,805 is the serial number of the application which resulted in patent No. 1,105,163.)

In addition to the Smith applications, the agreement between the Delaware Company and the New York Company covered a patent to and various applications for patents by Van Riper.

For brevity these agreements of April 10, 1915, will be referred to as one agreement, as there is no doubt on the evidence that Delaware Company was the owner of the Magnus Smith patent and application.

Before adverting to the terms of this new agreement, it is necessary to note that Harding testified that the new agreement was to be used only in case that Robinson obtained a verdict against the Delaware Company in the action then on trial. Plaintiff urges that Harding's testimony is to be accepted, and that it is confirmed by the fact that the parties must have contemplated that Robinson would gain a verdict in view of the successful outcome of the action against Van Riper.

The District Judge dealt with that contention as follows:

"The agreement of April 10, 1915, was made with a fuller knowledge, if possible, of Robinson's rights than its predecessor. The circumstances of its execution lend some color to suspicion that it was made against the possibility of a verdict. I think it was certainly made with that prospect in mind and to settle the rights which had arisen under the first contract, but I cannot accept Harding's statement that it was to be used only in case of a verdict. Some new contract was in any case necessary between the parties, and the possibility of such a one is foreshadowed as far back as the proposed contract between the New York Company and the Johns-Manville Company. Moreover, it is most unlikely that the drafting was left till April 10th, as Harding recalls; the contract is elaborate and could not be made hastily out of the earlier one. It shows evidence of much care in preparation, and bears the indorsement of Hobbs' lawyers, contrary again to Harding's recollection. However, while I reject the idea that it was intended only for such use, the time of its appearance justifies a close scrutiny of its terms in comparison with those of the earlier contract."

The District Judge then proceeded to analyze the agreement of April 10, 1915, and to point out that it was difficult to determine whether the agreement of April 10, 1915, as a whole was more or less favorable to the Delaware Company than the agreement of May 9, 1914. We agree with his conclusion that if the patent turned out only a moderate success, the change was a benefit to the Delaware Company, but that if the patent turned out successfully, the agreement in the long run would be more favorable to the New York Company and less favorable to the Delaware Company than was the agreement of May 9, 1914.

The situation must be approached from the standpoint of the surrounding and preceding circumstances. The District Judge had the advantage of seeing and hearing the witnesses, and in so far as the credibility of the witnesses is involved, we accept his conclusion. This conclusion we think was further borne out by all the circumstances. We are satisfied that up to this time the machines had not been made commercially successful. On this point the testimony of the expert Lowenstein is amply convincing, and the testimony on behalf of plain-

tiff of the expert Berger, who had worked on these machines at the Garford factory, is really confirmatory of this view, because Berger admitted that before the machines could be made commercially useful it was necessary to introduce certain changes which Berger refused to disclose because they represented patentable differences.

The New York Company had previously (about January, 1915), through Hobbs and Hammond, taken up the question of a license arrangement and sales agency with the H. W. Johns-Manville Company, a large concern in touch with motion picture exhibitors, by reason of. its manufacture and sale of certain other products needed in the motion picture business.

The evidence is fully satisfactory that Hobbs and Hammond were acting in good faith in their own interest in a situation where the future of the patents was very much in doubt, and the past experience had been very discouraging. It may be assumed that they feared that if Robinson obtained a judgment it might be difficult to deal with him, but this view is not an indication of fraud nor of any attempt on the part of the New York Company to hinder, delay, or defraud creditors, provided that the agreement of April 10, 1915, was one which did not put the property of the Delaware Company beyond the reach of Robinson, nor deal with it under such circumstances as to indicate an intent to hinder, defraud or delay.

Once it is found that the contract of May 9, 1914, was legitimate and fair, then it must follow that the modification embodied in the contract of April 10, 1915, was on all the facts and in all the circumstances fully justified; and in this connection it may be observed that there is nothing in this record which indicates that Hobbs and Hammond were in any manner in any scheme or collusive effort to deprive Robinson of any of his rights and that the acts of Van Riper and his associates hereinafter referred to are not brought home to the knowledge of Hobbs and Hammond by any evidence in this record.

The situation was that the only money in sight by which anything whatever could be done to develop the commercial success of these patent machines was forthcoming from Hobbs and Hammond, and in an enterprise which at that time was very doubtful and the future of which was speculative, it is quite plain that Hobbs and Hammond were right in insisting upon such modifications as they obtained by virtue of the contract of April 10, 1915.

We conclude, therefore, that the District Judge was right in determining not to set aside the agreements of May 9, 1914, and of April 10, 1915.

[2] Second. After Robinson obtained his judgment against the Delaware Company, execution was issued to the marshal and returned nulla bona on May 26, 1915.

The main business of the company had been conducted from its Chicago offices, where Van Riper and others interested in the company resided. One Truett was the president and a director of the Delaware Company, and he could be reached by service of process in New York City.

On April 21, 1915, Truett tendered his resignation as president of the Delaware Company, but not as director, and the resignation was accepted at a meeting of the board of directors of the Delaware Company held on April 21, 1915.

On June 5, 1915, Robinson obtained an order for the examination of the Delaware Company in supplementary proceedings, the order requiring that the Delaware Company, judgment debtor, should appear for examination by its president, Truett, on June 11, 1915. This order was served on Truett on June 7, 1915. On June 10, 1915, the copy of the order which had been served on Truett was given to Harding by Slease or Van Riper (Harding did not recall which). Harding appeared with Truett when Truett was sworn, and did not enter any objection to Truett's examination on the ground that Truett had resigned, or that he was not president of the corporation, or that he (Harding) had no authority to appear generally in the proceeding. Harding had not received any information or intimation that he was not authorized to appear upon that examination.

On June 10, 1915, another order was made by the District Court for the examination of the Delaware Company in supplementary proceedings, this time requiring Van Riper to appear. This order was served the same day, and it is conceded that the service upon Van Riper as a director was valid service upon the company. The attorney for Robinson continued in his pursuit of the judgment debtor against obvious efforts to obstruct Robinson from collecting his judgment, until he succeeded in obtaining an order on June 21, 1915, appointing a receiver in the supplementary proceedings. It was recited in the order that "the former president and treasurer of Vanoscope Company" (meaning Truett and Van Riper) had been examined thereunder, and that notice of the motion for appointment of a receiver could not be served on any officer of the defendant in the state of New York, and that such notice of motion was dispensed with. Under section 2464 of the New York Code, at least two days' notice of application for an order appointing such a receiver must be given personally to the judgment debtor unless the judge is satisfied that he cannot, with reasonable diligence, be found within the state.

On May 28, 1915, Truett purported to resign as a director, and it is now contended on behalf of defendants that the plaintiff's argument that the service on Truett was service on the Delaware Company is inconsistent with the affidavit of the attorney for plaintiff and the order made thereon, to the effect that the notice of motion for the appointment of a receiver could not be served within the state. We do not agree with this view. The order of June 21, 1915, stands valid and unassailed. There is nothing to negative the assertion made in the affidavit of the attorney for plaintiff that it was not possible to serve within the state the notice of motion upon any officers of the Delaware Company. The Delaware Company, by reason of its conduct, cannot be heard to assert that some officer could have been served; on the other hand, plaintiff, as the owner of the Robinson judgment, is entitled to urge that the service on Truett was valid service on the company. This service upon Truett becomes exceedingly important

for the reason that the petition of the Delaware Company in a voluntary proceeding in bankruptcy was filed on October 8, 1915. The service on Van Riper, therefore, came within the four months' period under the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 544), while the service on Truett took place outside of the four months' period.[1]

From the time the judgment was entered the Delaware Company resorted to every means at its disposal to prevent the collection of the Robinson judgment. See record in Re Vanoscope Co., 233 Fed. 53, 147 C. C. A. 123.

On July 15, 1915, a special meeting of the Delaware Company was held at Chicago, the only persons present being Van Riper and one Morhardt, a man closely associated with Van Riper. The minutes of that meeting recite that it was called pursuant to a written request signed by Van Riper and Morhardt and go on to state that all of the directors and officers, with the exception of Satterfield, Morhardt, and Van Riper, had tendered their resignations, and thereupon a new board of directors was elected. The minutes also recite that the resignations of the directors and officers were accepted.

It will be noted that Truett purported to send forward his resignation as director to Morhardt as secretary of the Delaware Company at Chicago on May 28, 1915, just two days after Robinson's execution against the Delaware Company had been returned unsatisfied. It is an interesting fact that while Truett resigned as president in April, he did not attempt to resign as a director until after the execution had been returned unsatisfied as above stated. Whether this was an accidental omission in the scheme of Van Riper and his associates to evade collection of the Robinson judgment does not appear, but it would not be strange if, by some mischance, Truett had not been advised to resign as director as well as president.

We are fully satisfied from the record (exhibiting various acts unnecessary to set forth in detail) that the resignation of Truett was merely an obstructive device in fraud of Robinson to prevent service upon an officer and director who could be served within this jurisdiction, the purpose clearly being that only those who were nonresidents should remain as directors, thus leaving the difficult task of serving the order in supplementary proceedings to the chance of finding one of the nonresident directors such as Van Riper within this jurisdiction.

There are cases which hold that in the absence of statutory regulations the resignation of an officer of a corporation takes effect on his

[1] NOTE.—Section 2468 of the New York Code reads:

"The property of the judgment debtor is vested in a receiver, who has duly qualified, from the time of filing the order appointing him. *   *   *"

Section 2469 of the Code reads:

"Where the receiver's title to personal property has become vested, as prescribed in the last section, it also extends back by relation, for the benefit of a judgment creditor in whose behalf the special proceeding was instituted as follows:

"1. Where an order, requiring the judgment debtor to attend and be examined,  *   *  ,  * has been served, before the appointment of the receiver, or the extension of the receivership, the receiver's title extends back, so as to include the personal property of the judgment debtor, at the time of the service of the order or warrant."

delivery to the proper officer of his written resignation and before acceptance thereof by the board of directors; but in these cases some remedy is sought against the director personally, and the basis of these decisions is that where a director thus resigns, the inaction or refusal of a board of directors should not impose upon him a future liability or responsibility which he does not desire to undertake. International Bank of St. Louis v. Faber, 86 Fed. 443, 30 C. C. A. 178; Fearing v. Glenn, 73 Fed. 116, 19 C. C. A. 388; Manhattan Co. v. Kaldenberg, 165 N. Y. 1, 58 N. E. 790.

There may also be cases of which Continental Wall Paper Co. v. Lewis Voight & Sons Co. (C. C.) 106 Fed. 560, is an example, where an officer or director of a foreign corporation, who intends to visit another jurisdiction, may resign in order to avoid service of a summons in a foreign jurisdiction. But the case at bar falls in that class of cases in which the courts have expressed their condemnation of proceedings by which resignations of officers or directors of a corporation are attempted in order to effectuate a fraud.

In Zeltner v. Zeltner Brewing Co., 174 N. Y. 247, 66 N. E. 810, 95 Am. St. Rep. 574, it was held that where all the officers, except the secretary, and all the directors of an insolvent corporation resigned for the express purpose of instituting an action to procure the appointment of a receiver under the New York Code, such resignations are neither legal nor effective. See, also, Ehret v. Ringler, 144 App. Div. 480, 129 N. Y. Supp. 551.

The fact that Truett's resignation as a director was to take effect immediately, and that acceptance under the by-laws of the Delaware Company might not be necessary, does not change the situation, although it appears from the minutes of the special meeting of July 15, 1915, that Van Riper and Morhardt thought that it was necessary formally to accept the resignations of the directors. But whether or not this would be so in a legitimate transaction is immaterial here; for mere forms of procedure will be disregarded if those forms are utilized to perpetrate a wrong.

We need not be concerned with a consideration of the effect of the resignation of Truett as president if he was still a director on June 7, 1915; for whatever may have been the result of his resignation as director, as between him and the Delaware Company, in their relations with each other, that resignation was futile and of no effect as avoiding the service of the order in supplementary proceedings made on June 7, 1915; and we hold that service valid as against the Delaware Company.

On October 14, 1915, the receiver in supplementary proceedings sold his right, title, and interest in and to the property of the Delaware Company, and in the list of that property were the various patents herein referred to. The purchaser at the sale was this plaintiff, and by this sale the plaintiff became the owner of the patents subject to the license agreement of April 10, 1915, and subject to the execution and delivery of such instruments as were necessary to perfect the title to the patents.

[3] About a year later, on September 27, 1916, after a meeting of creditors had been called by the referee in bankruptcy, the trustee in bankruptcy was authorized, over the objection of plaintiff, to sell all his right, title, and interest in and to the same property which the receiver in supplementary proceedings had sold. Hathaway, the president of defendant Continental Motion Picture Company, Incorporated, was the purchaser at the trustee's sale, paying the sum of $1,000, and thereafter Hathaway released to the defendants the cause of action against them. The trustee, however, had nothing to sell, because whatever there was had previously been sold by the receiver. It is true that patents are not subject to seizure and sale on execution. Ager v. Murray, 105 U. S. 126, 26 L. Ed. 942, and there is authority to the effect that a receiver, such as one in supplementary proceedings, does not, by virtue of his appointment, acquire title to patent rights. It is, however, well settled that a court of equity may order or decree that the proper person shall execute such assignment or other instrument as may be necessary to vest the title of the patent in the person entitled thereto. Ager v. Murray, supra; Gillette v. Bate, 86 N. Y. 87.

After the sale by the receiver, there remained with the trustee only the duty of executing and delivering any and all formal instruments necessary to perfect the title of the purchaser at the receiver's sale. No demand was made by plaintiff upon the trustee so to do, but under the bill of complaint and the issues made, the court has full power to order the trustee to fulfill these formal requirements.

If there should be any question as to the necessity of the execution of such instruments by Hathaway, plaintiff is at liberty to institute such action or proceeding in that regard as it may be advised.

The result of the foregoing is that the decree of the District Court must be modified so as to decree that the trustee shall execute and deliver to plaintiff any and all assignments or other instruments necessary to vest in plaintiff the title to all property sold by the receiver in supplementary proceedings subject to the license agreement of April 10, 1915.

As thus modified, the decree is affirmed, without costs in this court or in the District Court, and the District Court is directed to make its decree in accordance herewith.